IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

SEA PERCH RV RESORT LLC,      )
                                    )
          Plaintiff,          )          TC-MD 100363
                                      )
          v.               )
                                      )
LANE COUNTY ASSESSOR,      )
                                    )
          Defendant.        )          **DECISION**

Plaintiff appeals the values of 33 undeveloped lots (subject property)[1] for the 2009-10 tax year. Trial on the matter was held by telephone on May 2, 2011. Plaintiff was represented by David E. Carmichael, attorney at law. Spencer Powell (Powell), an appraiser with 35 years of appraisal experience and holds a Member Appraisal Institute (MAI) designation,[2] testified on behalf of Plaintiff. Defendant was represented by Bryce Krehbiel (Krehbiel), an Oregon registered appraiser with the county assessor's office. Plaintiff submitted Exhibit 1 -- a retrospective appraisal entitled "Summary Report" prepared in September 2010 with an effective date of value of January 1, 2009. Defendant submitted Exhibits A through VV -- value information sheets from the assessor's computerized database, numerous informational documents pertaining to the subject property acquired by Defendant from the Internet, and two appraisal reports prepared by Powell for Umpqua Bank. Plaintiff submitted post-trial rebuttal Exhibits on May 10, 2011, labeled 1 through 6. Defendant filed a "Post-trial Submission" on May 10, 2011.

---

[1] The 33 lots are identified by the following account numbers: 1824653, 1824646, 1824638, 1824620, 1824612, 1824604, 1824596, 1824588, 1824570, 1824562, 1824844, 1824836, 1824828, 1824810, 1824802, 1824794, 1824786, 1824778, 1824760, 1824752, 1824745, 1824737, 1824729, 1824711, 1824703, 1824695, 1824687, 1824679, 1824661, 4274435, 4274393, 1834884, and 1834876.

[2] The MAI designation is a special designation awarded by the Appraisal Institute to those who have met certain education, testing, and experience requirements.

## I.  STATEMENT OF FACTS

The appeal involves the real market value (RMV) of certain real property on the Oregon coast located approximately seven miles south of the town of Yachats in Lane County.  (Ptf's Ex 1 at 19.)  According to Powell, "[t]he Yachats-Waldport area has a recreation and retirement orientation with tourism as a major economic force." (*Id.*)  The site is a 3.02 acre parcel of land on the west side of coastal Highway 101 that abuts the Pacific Ocean.  (*See* Ptf's Ex 1 at 5.)

Plaintiff purchased the property, known as the "Sea Perch RV Park," in May 2006 for $2,100,000.   (Ptf's Ex 1 at 9; Def's Ex KK at 2.)  According to an e-mail sent to Plaintiff's counsel Carmichael by Jim Tully (Tully), a person involved in the acquisition of the subject property at the time of the purchase, "[t]he property consisted of 38 [recreational vehicle (RV)] sites with 3 commercial buildings, a bathhouse, and clubhouse." (Def's Ex KK at 2.)  Tully explains that after the purchase, the property was "renovated and reconfigured." (*Id.*)  Plaintiff reduced the "overall sites from 38 to 29," "demolished the clubhouse, bathhouse, and sea shell gift shop," "renovated the office/managers apartment," and "turned the sea shell museum into a clubhouse with restrooms." (*Id.*)  The clubhouse is a two-story structure with 2688 square feet of space on the first floor and 896 square feet on the second floor.  (Ptf's Ex 1 at 50.)  The second floor was designed and intended to be used by guests and owners as an "ocean observation room." (Def's Ex KK at 5.)  Tully further explains in his e-mail that Plaintiff "purchased two (2) Park Models and built two (2) cabana's [*sic*] on space #1 and #11." (*Id*. at 2.)  According to Plaintiff's September 2010 retrospective appraisal, the two "park models" are one-bedroom, one-bathroom, manufactured homes that can be purchased along with the underlying RV pad.  (Ptf's Ex 1 at 32, 38.)  Tully's e-mail states that "[t]he remodel work was completed in the spring of

/ / /

2008 and that the park was [then] reopened. The total cost of the remodel was $1,414,937 which puts the total cost of Land and improvements at $3,514,937." (Def's Ex KK at 2.)

A condominium plat was recorded on September 12, 2008 for the 29 newly-established RV sites, committing those sites "to the operation of the Oregon condominium act." (Def's Ex JJ at 1, 2.) As of January 1, 2009, which is the assessment date for the tax year under appeal (2009-10), the 29 sites were available for sale as individual improved RV sites.

Plaintiff's appraisal describes the property as a "resort [that] was improved with a remodeled office and clubhouse, new RV pads, paved interior streets, two new wells and an improved septic system" as of January 1, 2009. (Ptf's Ex 1 at 7.) All of the RV sites include water and electricity, sewer hookups, satellite television, Wi-Fi access, a picnic table, beach access, and a key to the clubhouse. (Def's Ex KK at 5.) The property also has an on-site manager, an office and mini-storage building, a dump station, and a common area with restrooms, showers, and a laundry facility. (*Id*.)

The parties agree that the subject property has a very good location; it is situated on the ocean with an exceptional view. Powell acknowledged such on cross-examination. Defendant's witness Krehbiel testified that the subject was an "exceptional" oceanfront property with an ocean view he described as "spectacular." The parties also agree that the real estate market had been in a general state of decline in the past few years.

While the subject property has 33 tax lot accounts, Plaintiff focused its case on the 29 converted condominium lots. Plaintiff requests a total RMV for all 33 tax lots of $1,610,000. In its Complaint, Plaintiff separated the properties into several groups and requested RMVs for the lots in those different groups. (Ptf's Compl at 1.) Plaintiff's requested RMVs range from a high of $93,000 each to a low of $3000 each. (*Id.* at 1-2.) Plaintiff requested that the 29 accounts be

valued in the following groups: 10 lots at $93,000 each, four lots at $71,000 each, and 15 lots at $82,000 each. (Ptf's Compl at 1, 2.) However, at the beginning of trial, Plaintiff advised the court that it was amending the petition to request that the value of the four "undisputed" lots which have an overall RMV on the assessment and tax rolls of $75,580, be subtracted from the $1,610,000 total requested RMV and that the remainder, $1,534,420, be divided by 29, to arrive at an average RMV per lot of $52,911 (rounded). Thus, Plaintiff is not challenging the current RMV on the rolls for those four tax lots (4274435, 4274393, 1834884, and 1834876). As indicated directly above, those four lots have a cumulative RMV of $75,580.

Krehbiel stated that two of the four accounts not being challenged (4274435 and 4274393) are mobile home accounts, and the other two accounts (1834884 and 1834876) are "ancillary 901 accounts." Defendant disagrees with Plaintiff's requested value and has asked the court to sustain the current total RMV of $5,710,580, which comes to approximately $194,000 per lot for the 29 lots at issue.[3] (*See* Def's Ans at 1.) The RMV of those 29 lots breaks out as follows: (1) at the rear of the property 10 tax lots have an RMV of $214,000; (2) at the front of the property in the southeast corner of the main tax lot four lots have an RMV of $165,000; and (3) in the center and at the northern edge of the main tax lot, 15 lots have and RMV of $189,000. (Ptf's Comp at 3-31; Def's Exs A-GG.)

The four undisputed tax lots have the following individual RMVs: (1) account 4274435 has an RMV of $21,780; (2) account 4274393 has an RMV of $27,500; and (3) accounts 1834884 and 1834876 have RMVs of $13,150. (Ptf's Compl at 32-35.)

All of the accounts have exception value equal to the RMV placed on those accounts by Defendant and sustained by BOPTA. (*Id*.)

---

[3] $5,710,580 – $75,580 = $5,635,000; $5,635,000 ÷ 29 = $194,310.

## II. ANALYSIS

At issue in this case is the RMV, for purposes of property assessment and taxation, of the 29 disputed tax lots. Oregon law defines a property's RMV as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1).[4] The tax year in this case is 2009-10, and the applicable assessment date was January 1, 2009. *See generally* ORS 308.007.

"The value of property is ultimately a question of fact." *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001). The party seeking affirmative relief has the burden of proof, and initially, "the burden of going forward with the evidence." ORS 305.427. The burden of proof in the Tax Court is a "preponderance" of the evidence. (*Id.*) This court has previously ruled that "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971).

RMV "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue and in accordance with [certain statutorily enumerated principles]." ORS 308.205(2). Those statutory principles that must guide the Department in its promulgation of valuation methods and procedures require an RMV determination based on "[t]he amount a typical seller would accept or the amount a typical buyer would offer that could reasonably be expected by a seller of property." ORS 308.205(2)(a). They also state that "[a]n amount in cash shall be considered the equivalent of a financing method that is typical for a property." ORS 308.205(2)(b).

/ / /

---

[4] Unless noted otherwise, all references to the Oregon Revised Statutes (ORS) are to 2007.

The Department's rule, in turn, generally provides for the valuation of all real property based on three standard approaches to valuation. OAR 150-308.205-(A)(2)(a).[5] Those approaches are the sales comparison approach, the cost approach, and the income capitalization approach. *Id.*; *see also Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003); Appraisal Institute, *The Appraisal of Real Estate* 130 (13th ed 2008). The rule does not require the *use* of all three approaches, but merely the consideration thereof.

Highest and best use is one of the initial and important considerations in the valuation of the property. Highest and best use is defined as "[t]he reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible, and that results in the highest value." OAR 150-308.205-(A)(1)(e); see also Appraisal Institute, *The Appraisal of Real Estate* 277-278 (13th ed 2008). The concept of market value or RMV assumes that market forces will seek the maximum benefits from property.

A.    *Highest and best use*

Plaintiff's appraiser, Powell, testified that the property's highest and best use is as an RV park, notwithstanding the condominium replat in September 2008. Powell testified on cross-examination that the property had been platted in September 2008 to establish individual RV condominium lots; however, the dramatic economic downturn in the fourth quarter of 2008 changed the highest and best use of the property to a rental park that leased spaces to interested parties. Powell addresses the highest and best use issue at length in his September 2010 appraisal. There, he noted that while the concept of condominium ownership of RV pads had thrived in certain warm climate areas in 2009, it was a relatively new concept on the Oregon coast. (Ptf's Ex 1 at 55.)

---

[5] References to the Oregon Administrative Rules (OAR) are to the current edition of those rules.

Powell testified at some length about the downturn in the economy. He spoke of the financial crisis both locally and nationally, including the plummet in the Dow Jones average between October 2007 and March 2009, during which the Dow dropped from approximately 14,000 to 6600. Plaintiff's Rebuttal Exhibit 1 indicates that at the time of Powell's August 2008 appraisal, the Dow Jones average was 11,628. (Ptf's Reb Ex 1 at 1.) A sharp decline followed between September 26, 2008, and October 10, 2008, plunging the average from 11,143 to 8,451. (*Id*.) By January 1, 2009, the Dow had risen slightly to 9035 (rounded). (*Id*. at 2.) In his appraisal, Powell states that "market participants indicate that the market for RV parks fluctuates with the national economy * * * [and that] [g]asoline prices also have an impact on the RV business." (*Id*. at 54.) Powell's report notes that the overall decline in the market halted the development of destination RV resorts for overnight guests, which he predicts will secure "the continued long-term viability of the subject as a destination RV resort." (*Id*. at 55.) Powell contrasts the outlook for the subject as an RV destination resort with the overall marketability of RV ownership pads, concluding that the outlook for the sale of RV pads remains bleak. (*Id*. at 55 and 56.) Powell supports that conclusion through an analysis of three area resorts, all of which had virtually no sales, stating that "[s]ales of the deeded lots decreased significantly between 2007 and 2009, both in number of lots sold and average sales price." (*Id*. at 56.) The court was initially skeptical about the assertions made by Plaintiff during opening statements, but found the testimony of Powell and the data in his appraisal persuasive and compelling.

Powell further testified that a dramatic decrease in available financing for residential properties, and particularly single-family homes, triggered a decline in the values of single-family residences. Powell stated that the real estate market "dried up." Additionally, Powell testified that employment on the coast is seasonal. A graph in Powell's September 2010

appraisal demonstrated that the coastal unemployment rate increased to more than 10 percent from January 2008 to January 2009. (Ptf's Ex 1 at 52.) Powell's testimony and his appraisal report also addressed the collapse of the RV industry; a number of the area's leading RV makers reduced employment and production, while several filed for bankruptcy. (*Id.*)

Defendant insists that the property's highest and best use as of January 1, 2009, was as an RV condominium resort and not an RV park. Defendant bases that assertion on the fact that the subject was platted for condominium marketing (i.e., sales of the 29 RV pads), and on Powell's August 2008 appraisal for Umpqua Bank, which concluded that the subject's highest and best use at that time was "an RV subdivision with separate deeded RV Pads." (Def's Ex UU at 57.)

The court has carefully considered the evidence and is persuaded that the highest and best use of the subject property, as of January 1, 2009, was as an RV park with oceanview and oceanfront RV spaces for rent to the general public. At the time of the January 1, 2009, assessment date, it was not financially feasible to sell the individual condominium RV pads. Plaintiff provided substantial evidence to so persuade the court.

B.     *Value*

Plaintiff submitted an appraisal prepared by Powell in September 2010 with a retrospective fee simple value of $1,610,000. (Ptf's Ex 1 at 2.) Powell considered all three approaches to value, but concluded that the income capitalization and sales comparison approaches were the best indicators of value. (*Id*. at 64.) Powell's value under the income approach came to $1,610,000 based on potential gross income of $558,450, a 60 percent vacancy and credit loss, estimated expenses of $90,758, which resulted in a net operating income of $132,622. (*Id*. at 72-78.) Powell then applied a capitalization rate of 8.25 percent based on an analysis of seven comparable sales, which resulted in a final value estimate of $1,607,535, which

Powell rounded to $1,610,000. (*Id.*) For his sales comparison approach, Powell looked of the sales of five comparable RV resorts and determined that the indicated value under that approach was $1,595,000. (*Id*. at 79- 83.) Powell testified that neither the current roll value (RMV) of approximately $5.7 million nor the approximately $3.5 million Plaintiff had invested in the property as of the assessment date represented the market value for the subject property; he testified that cost is not always value. Powell gave greater weight to the income approach than the sales comparison approach and concluded with an estimated market value as of January 1, 2009, of $1,610,000. (*See id*. at 86.)

Defendant did not submit an appraisal report. Krehbiel testified that Powell twice valued the property prior to the January 1, 2009, assessment date and arrived at value conclusions considerably higher than the conclusion presented by Plaintiff through Powell at trial. Both of those appraisals were prepared for Umpqua Bank. The first of those appraisals gave a June 12, 2007, "As Is" market value estimate of $3,600,000. (Def's Ex TT at 77.) As that report indicates, the property was under construction at that time and market conditions were considerably different in June 2007. The other appraisal report, notes Krehbiel, estimates the "As Is" market value of the property to be $4,340,000 as of August 19, 2008. (Def's Ex UU at 118.) Krehbiel testified that he believed that the August 2008 report was the most relevant of the three reports prepared by Powell. According to Krehbiel, the Defendant's values are supported by a number of facts, including (1) the 2008 report; (2) Plaintiff's asking price for the RV pads of between $180,000 and $215,000; and (3) the $2.1 million purchase price, coupled with the subsequent renovation of the property, resulting in a total investment by Plaintiff of approximately $3.5 million. Krehbiel testified that these facts demonstrated that Plaintiff's value

/ / /

estimate for this appeal was inaccurate and that the value of approximately $5.7 million currently on the rolls should be sustained.

Powell was questioned extensively about the values in the three reports, including the retrospective appraisal report submitted by Plaintiff valuing the property at $1,610,000 as of January 1, 2009. Powell explained in some detail why he believed that the two Umpqua Bank appraisals done in 2007 and 2008 were not reliable indicators of value on the applicable assessment date. The court was persuaded by Powell's testimony. Moreover, Krehbiel acknowledged on cross-examination that he did not speak with the owner of the property or the park manager, or with any real estate brokers, nor did he perform his own highest and best use analysis or appraisal report. The court notes that the August 2008 appraisal not only includes a value estimate for the subject as an RV resort with marketable condominium RV pads, but also a much lower value of $1,800,000 for the property as an RV resort leasing spaces to the public on a temporary rental basis. (Def's Ex UU 1, 90.) Again, Powell explained that a number of factors persuaded him that the condo concept, while viable at the time Plaintiff undertook the venture, no longer remained the best use of the property as a result of the crippled economy. The factors included (1) the reluctance of lenders to loan on real estate in general, especially RV condominium pads, (2) Plaintiff's inability to sell any of the RV pads, and (3) experiences shared by three other parks also attempting to sell RV spaces. Subsequent events demonstrated to Powell that the best current use of the property was to hold onto the property and rent the RV spaces, while waiting until the economy improved to attempt to sell the pads.

### III. CONCLUSION

After careful review of the evidence, both documentary and testimonial, the court concludes that the total RMV for the subject property was $1,610,000 as of January 1, 2009.

That value is to be broken down as follows: the 29 assessor accounts converted by Plaintiff to condominium pads, assessor accounts 1824653, 1824646, 1824638, 1824620, 1824612, 1824604, 1824596, 1824588, 1824570, 1824562, 1824844, 1824836, 1824828, 1824810, 1824802, 1824794, 1824786, 1824778, 1824760, 1824752, 1824745, 1824737, 1824729, 1824711, 1824703, 1824695, 1824687, 1824679, 1824661, shall have a cumulative RMV of $1,534,420, or $52,911 (rounded) per lot. The RMVs of the remaining four tax lots, assessor accounts 4274435, 4274393, 1834884, and 1834876, shall remain undisturbed at $21,780, $27,500, $13,150 and $13,150, respectively; the RMV for those lots shall total $75,580. Defendant determined the RMV of the 29 lots to be exception value, and placed it on the rolls as such; as a result, the exception value for those 29 lots shall be reduced to $54,413 each to match the court's RMVs. Finally, the maximum assessed value and assessed value shall be adjusted accordingly. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is granted as set forth above.

Dated this \_\_\_ day of March 2012.

_____
DAN ROBINSON
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Dan Robinson on March 2, 2012. The Court filed and entered this document on March 2, 2012.*